AF Approval __JMH__                         Chief Approval __CLK__

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                    CASE NO. 6:23-r-196-CEM-RMN

ISLAM DOCI
a/k/a Islam Doqi

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Roger B. Handberg, United States Attorney for the Middle District of Florida,

and the defendant, ISLAM DOCI a/k/a Islam Doqi, and the attorney for the

defendant, Russ Rosenthal, mutually agree as follows:

**A.**    **Particularized Terms**

1.    <u>Count Pleading To</u>

The defendant shall enter a plea of guilty to Count Three of the

Indictment. Count Three charges the defendant with making a false

statement, in violation of 18 U.S.C. § 1001(a).

2.    <u>Maximum Penalties</u>

Count Three carries a maximum sentence of 8 years'

imprisonment, a fine of up to $250,000, a term of supervised release of not

Defendant's Initials _I.D_

more than 3 years, and a special assessment of $100 per felony count for individuals.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.    *Apprendi v. New Jersey*

Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the defendant is subject to a maximum sentence of 8 years' imprisonment as to Count Three because the following facts have been admitted by the defendant and are established by this plea of guilty: the statements made involved international terrorism.

4.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count Three are:

| | |
|---|---|
| First: | The defendant made the statement, as charged; |
| Second: | The statement was false; |
| Third: | The falsity concerned a material matter; |
| Fourth: | The defendant acted willfully, knowing that the statement was false; |

Defendant's Initials ⎿ D

<u>Fifth</u>:      The false statement was made or used for a matter within the jurisdiction of a department or agency of the United States; and

<u>Sixth</u>:     The statement was made in an investigation involving international terrorism.

5.   <u>Counts Dismissed</u>

At the time of sentencing, the remaining counts against the defendant, Counts One, Two, and Four, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

6.   <u>No Further Charges</u>

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

7.   <u>Acceptance of Responsibility - Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or

Defendant's Initials ⌐ D̲⌐       3

request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.   Terrorism Sentencing Enhancement, USSG § 3A1.4

The United States intends to seek an enhancement to the defendant's guideline range under USSG § 3A1.4 because the defendant committed a felony offense that involved, or was intended to promote, a federal crime of terrorism. The defendant intends to dispute the applicability of this enhancement.

Defendant's Initials __J D__              4

**B.**  **Standard Terms and Conditions**

1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

Defendant's Initials ⌐ D⌐                    5

2.    <u>Supervised Release</u>

The defendant understands that the offense to which the

defendant is pleading provides for imposition of a term of supervised release

upon release from imprisonment, and that, if the defendant should violate the

conditions of release, the defendant would be subject to a further term of

imprisonment.

3.    <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon

conviction, a defendant who is not a United States citizen may be removed

from the United States, denied citizenship, and denied admission to the

United States in the future.

4.    <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the

Court and the United States Probation Office all information concerning the

background, character, and conduct of the defendant, to provide relevant

factual information, including the totality of the defendant's criminal activities,

if any, not limited to the count to which defendant pleads, to respond to

comments made by the defendant or defendant's counsel, and to correct any

misstatements or inaccuracies.  The United States further reserves its right to

Defendant's Initials ⎰ D ⎰           6

make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

     5.    <u>Financial Disclosures</u>

        Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to

Defendant's Initials _JD_        7

the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.  Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make

Defendant's Initials  I D                8

with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this

Defendant's Initials ⌐D___                9

office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront

and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials _I D_                    11

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 2nd day of ~~September~~ October, 2024.

ROGER B. HANDBERG
United States Attorney


Islam Doci a/k/a Islam Doqi
Defendant

Kara M. Wick
Assistant United States Attorney


Russ Rosenthal
Attorney for Defendant

for Dan Marcet
Assistant United States Attorney
Chief, National Security Section


Defendant's Initials I D                12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:23-cr-196CEM-RMN

ISLAM DOCI
a/k/a Islam Doqi

## PERSONALIZATION OF ELEMENTS

First:      Did you make the statement, as charged, i.e., did you
            answer "No, no" when questioned by the Federal Bureau
            of Investigation regarding the question posed in Count
            Three?

Second:     Was the statement false?

Third:      Did the falsity concern a material matter?

Fourth:     Did you act willfully, knowing that the statement was
            false?

Fifth:      Was the false statement made within an investigation by
            the Federal Bureau of Investigation, which was a matter
            within the jurisdiction of a department or agency of the
            United States? and

Sixth:      Was the statement made in an investigation involving
            international terrorism?

Defendant's Initials _I_D__                    13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:23-cr-196CEM-RMN

ISLAM DOCI
a/k/a Islam Doqi

## FACTUAL BASIS

On or about January 25, 2022, in the Middle District of Florida, the defendant, Islam Doci a/k/a Islam Doqi ("DOCI" or the "Defendant"), did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, and involving international terrorism; that is, during an international terrorism investigation conducted by the Federal Bureau of Investigation, the defendant was interviewed by federal law enforcement officers and was asked if he (DOCI) had been in Facebook groups. The Defendant answered "No, no" to that question. That statement was false, as the Defendant knew, because he (DOCI) had been a member of a private Facebook group named "ISIS (Islamic State open Law Shariah)," and had become an administrator for that group on

Defendant's Initials ⟨ D          14

or about October 13, 2019. DOCI had also been a member of other
Facebook groups.

At all times relevant, the Islamic State of Iraq and al- Sham, a/k/a,
ISIS, ISIL, the Islamic State, the Islamic State of Iraq and Syria, ad- Dawla
al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and the Al-
Furqan Establishment for Media Production, was designated by the United
States as a Foreign Terrorist Organization ("FTO").

In 2017, an FBI employee acting in an undercover capacity (the
"OCE") observed several public pro-ISIS posts on a social media account that
was later identified to be DOCI's account (hereinafter, the "Social Media
Account"),[1] including:

    a.    On or about June 24, 2016, DOCI posted a photo of a man holding
up a single index finger accompanied by the inscription "Baqya." The
index finger pointing up generally represents "Tawhid" or the oneness of
Allah. The image is also widely used as a symbol to identify ISIS
supporters to each other. "Baqya" also written bakija, bakiyah, or baqiya
means "remaining." It is often used in ISIS propaganda to indicate the

---

[1] DOCI used display names, "Islam Doqi" and "Creekwood Forlife" on the Social
Media Account.

Islamic State endures. Baqya, combined with the single index finger, is a commonly known image associated with ISIS supporters.

b.      On or about November 25, 2017, DOCI displayed a post that translates from Albanian to English as, "The Prophet said, The one who looks after a fighter's family, has participated in war."

c.      On or about November 28, 2017, DOCI shared a picture of the index finger pointing up with the caption in Arabic that translates to, "There's no God but Allah."

d.      On or about November 29, 2017, DOCI shared a post that, translated from Albanian to English, is, "If Islam is terrorism, then O God give me more of this terrorism until the day I die. If Islam is radicalism, then O God, give me more of this radicalism until the day I die."

In or around January 2018, FBI Tampa was notified regarding the promotion of extremist views on DOCI's Social Media Account, which prompted FBI Tampa to open an investigation. An open-source review of the Social Media Account along with tagged photos resulted in identifying the user of the Social Media Account as DOCI.

In March 2019, information obtained by subpoena from the service provider listed listed the name on the Social Media Account as "Islam Doqi"

Defendant's Initials ⹂ ⹂⹁⹀⹀      16

with a registered email address of islamdoqi@hotmail.com. Subpoena returns for that Hotmail email account revealed that the name on the registration profile was "Islam Doqi." At one point, the Social Media Account used the display name "Islam Doqi." In addition, a publicly available picture posted to the Social Media Account showed a "selfie" of a male (shown above) that was recognized as DOCI when compared to DOCI's driver license picture. The Social Media Account profile also listed a date of birth matching DOCI's date of birth.

In January 2020, search warrant returns from the Social Media Account showed that DOCI had consistently posted his support for ISIS on account. The search warrant returns further revealed that DOCI had communicated with at least four individuals (Associates 1 through 4), who are known ISIS members, regarding a desire to send money to help ISIS fighters in Syria.

The summary below captures DOCI's communications on his Social Media Account. The conversations summarized below between DOCI and Associates 1 through 4 were translated verbatim from Albanian to English by an FBI Language Specialist.

## CONVERSATIONS BETWEEN DOCI AND ASSOCIATE 1

On or about November 16, 2017, DOCI and Associate 1 discussed sending "zakat" (charity) to Associate 2. Associate 1 stated, "[Associate 2] is waiting on word from you." Associate 1 continued, "Should I tell him anything

Defendant's Initials ⌊ Ɗ       17

about you? That the brother is ready for the charity? Is it a matter of hours or days?" DOCI then replied, "Where should it be sent brother?" Associate 1 then provided DOCI with the following name and address for sending money:

"[Associate 2's spouse]
PISTULA BB
XXXXX ULCINJ
MONTENEGRO"

Associate 1 stated to DOCI that this was the name and address he had received in a message from Associate 2. After receiving instructions from Associate 1, DOCI stated that he would send the money on Monday.

On or about November 20, 2017, DOCI informed Associate 1 that he still planned to send money to the address Associate 1 had previously provided. DOCI then asked Associate 1 if it was okay to only send $100. DOCI explained this was all he could currently afford but he promised he would send more. DOCI stated, "Listen brother, that's what I can afford at the moment. Then we will see, because I will not leave it at that. I swear I do not have more for now. I do not regret a penny. Believe me brother." Associate 1 responded that he did not question DOCI's intentions and wanted DOCI to send money because they were in need stating, "Just send it to the brother please. Because I swear, they need it."

Defendant's Initials _/ D_                    18

On or about November 21, 2017, DOCI informed Associate 1 that he had kept his word about sending the money and stated, "Brother, I was true to my word. Thank God."

## CONVERSATION BETWEEN DOCI AND ASSOCIATE 2

On or about December 2, 2017, Associate 2 and DOCI had a conversation concerning security and protecting themselves from the authorities. Associate 2 explained that they chose to send the money through Montenegro because, "It is a tourist country that has never been accused or punished for any kind of terrorism. Millions of euros are transferred each month." DOCI responded, "Yes, brother, I understand. I do not care at all. Even if they ask me where I sent it, it is very easy, "I have debts or... to my family. However, no one will inquire because 100 or 200 is not a lot of money." Associate 2 and DOCI continued to discuss security concerns. Associate 2 concluded, "... we do not dare to discuss details brother, we do not dare. This is in order to protect you and us."

On or about December 6, 2017, Associate 2 reported to DOCI that he had received money from Associate 3. "[Associate 3's] money arrived, 500 Euros. May God reward him and all of you who are getting involved. Peace be upon you. The pledge has reached its destination. Now you all know who you are. And do not be shy about talking to the brothers about

assistance…Not in details, because us (you and us) do not need to provide justification to anyone. God rewards everyone based on their intentions."

On or about December 11, 2017, DOCI and Associate 2 complained that people did not contribute money. Associate 2 stated if there were 20 Albanian brothers like DOCI, each giving $100 Euros, they could accomplish a lot with $2,000 Euros. DOCI asked Associate 2 the identity of those who had helped and those who had not. DOCI added that most people talked nonstop about the Caliphate. Associate 2 replied that only DOCI, Associate 3, and a brother from Switzerland had sent money, specifying that Associate 3 had sent $500, DOCI had sent $100, and a brother in Switzerland had sent $160.

On or about January 12, 2018, Associate 2 sent DOCI a message that the situation was serious and funds were needed immediately to help the brothers, "But keep in mind that we in the Balkans are setting aside thousands of euros for this cause that is why we are asking for relief, because we do not intend to abandon our brothers in the middle of this for we will be held accountable on judgment day." DOCI responded that he was financially unable to send money at the moment but expressed his desire to help by stating, "If I could, I would have sent it right away without any questions asked."

On or about January 28, 2018, DOCI stated to Associate 2 that there were people that were unhappy that DOCI had sent only $100 Euros, stating, "My feelings got hurt a little bit too, because in regards to the 100 I sent, I heard that they were not pleased that I sent 100. I sent what I was able to, and then it is not right for them to say that I sent too little." DOCI asserted that he did not care where the money wound up because he did it for Allah, "In my own view, when I sent the money I did not concern myself as to where the money went at all, because I did it for God and not for fame or recognition."

Associate 2 further explained to DOCI the security and logistical concerns involved in sending the money. Associate 2 stated, "We have been doing this work for many years. The main issue is that the brothers ask many questions, and we are not able to give many answers, names or last names, because we are not "Jetimat e Ballkanit" [Balkan's Orphans] who have millions of euros in funds each year. This is where the suspicion starts, but it is normal. However, we are not courageous (brave) as to say, Brothers this goes to Sham,[2] this goes here, and that goes there, because we were instructed by the incarcerated imams that it is better to have one free individual than 100 incarcerated ones. I am the only person who has made his first and last names known, because even if they detain me as they did a few years ago, laws in

---

[2] "Sham" is a term used to refer to Syria and the surrounding region.

Defendant's Initials ⏜·⏝          21

Montenegro are not as strict."

## CONVERSATION BETWEEN DOCI AND ASSOCIATE 3

On or about November 7, 2017, DOCI had a conversation with Associate 3 about more people supporting ISIS. DOCI stated that he knew many people who previously were against ISIS but now understood the truth, stating, "Yes I swear brother, I know many who were against it but now understand the truth." DOCI further explained that his wife and friend were confused but now understand, stating, "... praise be to Allah all are with the Islamic State." DOCI later stated, "I am telling myself this brother, if I don't go and even not fight, to just give food to the lions there and to wash their feet."

On or about November 30, 2017, DOCI informed Associate 3 that the Social Media Account page "Bota Islame" (translated in English as "The Islamic World") was asking for help for the families of the shahids. DOCI stated that he had sent $100 Euros, explaining, "[Associate 1] had talked with [Associate 2]. They said that Bota Islame page is asking for help for the martyrs' families and the place to send the money is in Ulcinj, and I sent it where [Associate 2] and [Associate 1] told me, 100 as a start." Associate 3 questioned DOCI about sending money to Associate 2 and DOCI replied that he did not know Associate 2 personally, but explained that he had sent "it with the intent for martyrs' families and they can go wherever they want."

Later, DOCI sent a screenshot of a conversation with Associate 2 to Associate 3. The screenshot contained the name and address of [Associate 2's spouse] in Ulcinj, Montenegro. After sending the screenshot, DOCI stated to Associate 3 "Brother listen, as much as you are able to." DOCI then asked Associate 3 if he knew how to send the money, to which Associate 3 replied that he would send it through Ria (a money-transfer company that conducts world-wide transfers). DOCI advised Associate 3 that he (DOCI) had previously sent the money through Western Union and explained how much it had cost him in fees and currency.

DOCI then asked, "Under what name are you sending it brother? Because it's necessary to give them the name so they know. There is a sister who gets the money." Associate 3 responded, "With my name [Associate 3]. As far as I know in Ria's system I have it [XXXXXX] not [XXXXXX][3] but anyhow you can tell them both." DOCI explained to Associate 3 that Associate 2 had said that there were no Rias and that Western Union was the safest to use. DOCI instructed Associate 3 to provide his full name when sending the money. Associate 3 again replied "Okay no problem. [Associate 3] is sending it since it's with Western Union."

---

[3] Associate 3's statement is explaining that, in Ria's system, he has his last name spelled incorrectly.

Defendant's Initials ⌐ D     23

## CONVERSATION BETWEEN DOCI AND ASSOCIATE 4

On or about November 29, 2018, DOCI asked Associate 4 if anyone from out of the country has helped him, "Does anyone from out of the country help you? Or do they know what the situation is like there in al-Dawla?"[4] Associate 4 revealed to DOCI that Associate 3 was planning on sending him $500 Euros, stating, "[Associate 3] mentioned sending me 500 euros, but I am looking into how to bring it in. DOCI responded that he hoped to join in sending money, "God willing, I will join that caravan too. Because [Associate 3] and I do almost everything together."

On or about December 11, 2018, Associate 4 revealed to DOCI that he had been accused of stealing money intended for the wives of the martyrs. Associate 4 denied these allegations. DOCI lamented the situation stating, "Because I very much regret reaching this point in this matter, especially for you who are in the battlefield and sacrificing yourself." DOCI later stated, "Listen to what I am telling you brother, because I do not personally know you. I just know you are one of God's jihadi fighters." Associate 4 called DOCI a brother of his, regardless of money stating, "To me you are like my brother. I love you whether you send me money or not. You are my brother."

Later in the conversation, DOCI stated that he and others had raised

---

[4] Al-Dawla refers to ISIS.

money and sent it to Associate 2. DOCI then explained, "Now we learned that the money did not reach its destination." "He said that they could not get the money there, but they sent it to the orphans in Europe. And I do not know, but that brought up some suspicion brother. That's where this matter started. That's where things got entangled." Associate 4 said that he is not in Europe. DOCI continued, "But now he said that the money was sent there, in the land of Tawhid, which means Sham." DOCI and Associate 4 continued to discuss the accusations concerning the money. DOCI then explained to Associate 4 that they were all headed on the same path stating, "We all are on that same path, and just because we are not all carrying a Kalashnikov over there it doesn't mean…" Associate 4 agreed, "May God increase the numbers of good brothers everywhere!" DOCI responded, "Someone with a Kalashnikov, someone with money and someone with prayers." As they said goodbye, DOCI stated, "Greetings to the other jihadi fighters."

On or about December 14, 2018, DOCI expressed to Associate 4 how difficult it was to help someone from the Islamic State, "You cannot get two people together when it comes to helping the Islamic State, but thousands get together when it comes to helping the polytheists." Associate 4 tried to calm DOCI down, "Don't get distressed." But DOCI continued, "No brother, but it's upsetting because they pretend they support the State but when it comes to

helping out they even close their accounts."

Associate 4 asked DOCI for help with a money transfer. Associate 4 told DOCI there was a brother in Texas who wanted to send Associate 4 $500 but Western Union had banned the brother from sending money to him. Associate 4 wanted DOCI to obtain the money from the brother in Texas and then send it to him. DOCI stated he had the same problem with Western Union and MoneyGram but advised there was another company named Ria. DOCI instructed Associate 4, "Tell the brother to send it to someone else's name. I tried it with my wife and we had issues, because when I sent money to [Associate 2] they asked me where I sent the money to. I asked brother [Associate 3] to send the money I wanted to send you on my behalf and then I would pay him back. But God willing we will find another route."

### ISLAM DOCI'S FACEBOOK GROUP MEMBERSHIP

Facebook search warrant results revealed that, on or about October 13, 2019, DOCI was appointed an administrator of the private group named "ISIS (Islamic State open Law Shariah.)" Another administrator of the group ("Administrator 1") messaged DOCI, "Brother I left you as an admin in this group too. If they block my [social media account], at least the private group does not get shut down. Now you can add too. Only allow pro-Islamic State to join. Others who talk nonsense don't admit them because they'll just upset

us." DOCI replied, "Not everyone can enter here."

Administrator 1 chose the group to be private and stated to DOCI, "Because private they can't block us and public we are done." DOCI replied, "Yes, they block us right away public." Administrator 1 then stated, "We have methods to return again. We have remained for five years and will continue…God willing." DOCI responded, "God willing brother. But must be careful."

## INTERVIEW WITH ISLAM DOCI IN JANUARY 2022

On January 25, 2022, FBI special agents conducted a recorded non-custodial interview with DOCI at the Orlando International Airport, located in the Middle District of Florida. DOCI was informed at the onset of the interview that if he made a false statement he could be punished under federal law. The interview was conducted in English, and DOCI answered questions and otherwise communicated with the agents during the interview without issue. After being informed of 18 U.S.C. § 1001, DOCI agreed to speak with the agents and made the following statements, which were shown to be false based on the content of DOCI's Social Media Account:

### a. *DOCI's Participation in Online Social Media Groups*

FBI:    Were you in like groups? Uh, on Facebook they form these groups. You know on Facebook you can form a group. You can have a group where there's a bunch of people inside the group communicating. You can make it private, you can make it public.

Defendant's Initials _I D_        27

DOCI:    No, no.

FBI:    Were you a part of any of those kind of groups?

DOCI:    No, I never go to that…No the groups? No, I don't like that. Like whenever I talk, I talk straight. Hey, this is this and this is this.

### b. *Statements Regarding DOCI'S Support of ISIS*

FBI:    So you never supported them in anyway?

DOCI:    No, no, no, no. Support who?

FBI:    ISIS or al-Qaeda.

DOCI:    No. Support what? Support people that they kill innocent people? No, no, no, no, that's not gonna happen.

                                …

FBI:    That is a conversation over a month and a half time period between you and this person right here. And in that time frame you're talking about things like supporting this group right here which is ISIS. That you put ISIS on.

DOCI:    I'm not gonna. I never support and I'm not gonna support this ever never.

FBI:    Have you ever said you supported ISIS?

DOCI:    No.

FBI:    Never said it?

DOCI:    No, and I'm not going to support that.

### c. *DOCI's Spread of ISIS Propaganda*

FBI:    And you've never spread any of their propaganda or anything like

Defendant's Initials ___        28

that?"

DOCI:      No, no, no, no, no. I don't need that.

### d. *DOCI's Knowledge of Associate 3*

FBI:       So what he told us. Um that there was another subject and he
           named him, he named him [Associate 3]. Does that ring a bell?

DOCI:      Who's that?

FBI:       [Associate 3].

DOCI:      [Associate 3]. I don't know a [Associate 3].

FBI:       You have no clue who that is?

DOCI:      No. [Associate 3]. No. It's no.

### e. *DOCI's Provision of Guidance on Sending Money*

FBI:       Have you ever provided guidance to other people on how to send
           money overseas?

DOCI:      No, no, no.

FBI:       She's clarifying that like even sending it through Western Union
           or MoneyGram or anything like that.

DOCI:      No.

FBI:       Not anything illegal, just the normal exchange.

DOCI:      No, I know. No, no.

FBI:       So you've never told someone how to do MoneyGram or Western
           Union?

DOCI:      No. Everybody knows about that. How I'm gonna know?

### f. *DOCI's Communications with and Knowledge of Associate 4*

FBI:        Was [Associate 4][5] a fighter for ISIS?

DOCI:       Who?

FBI:        [Associate 4].

DOCI:       I don't know.

FBI:        He didn't tell you?

DOCI:       No, no, no, no. He did not say that. I'm telling you he could be, he could in you know. In my city drinking coffee.

---

[5] Throughout the interview, agents refer to [Associate 4] by his display name on his social media account.

Defendant's Initials ___    30