## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**v.**                                        **Case No. 6:23-cr-196-CEM-REM**

**ISLAM DOCI**

_____/

### SENTENCING MEMORANDUM AND MOTION FOR VARIANCE

The defendant, ISLAM DOCI, by and through undersigned counsel, files this Sentencing Memorandum and Motion for Variance:

### Introduction

Mr. Doci pled guilty to a single count of making a false statement in violation of 18 U.S.C. § 1001. In 2017, Mr. Doci was identified as maintaining a social media account which had pro-ISIS posts. Through investigation, the Government was able to track this activity covering between 2016-2018 and initiated an investigation in January 2018 PSR ¶ 13.  The Government was also able to isolate online communications seeking to raise small amounts of money to send overseas ostensibly for support of those involved in the Syrian conflict during the same time-period. PSR ¶¶ 16-34. There is no allegation that Mr. Doci ever participated or intended to participate in any act of violence. Nor was he ever charged with providing material support to terrorism or any offense arising from his online involvement.

However, on January 25, 2022, Mr. Doci was approached by FBI agents at the Orlando International Airport where he worked and agreed to a voluntary interview. During the interview the Government alleges that he made several false statements including that he was not involved in any pro-Isis Facebook groups. This was the count of conviction.

The United States Probation Office has prepared a Presentence Report (PSR), which has calculated his applicable range under the federal sentencing guidelines as the statutory maximum 96 months imprisonment. This calculation is driven by the USSG §3A1.4 enhancement which applies only where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."

The Government has submitted a sentencing memorandum in support of the § 3A1.4 enhancement and for a sentence within the guideline range. This is based considerations that are remote in time and, respectfully, substantially exaggerate Mr. Doci's level of involvement.

According to the Probation Office the applicable guideline range in the absence of this provision would be 37-46 months imprisonment based on total offense level 21, Criminal History Category I. PSR addendum, Doc. 79:22.

Mr. Doci submitted objections to the enhancement. Should the Court impose the enhancement, he maintains that a sentence well below the guideline range as a downward variance would be appropriate.

In furtherance of his position, Mr. Doci attaches a report by Jennifer Cormack, a former FBI agent who was involved in investigating terrorism offenses. Appendix C. (Cormack Report). Ms. Cormack's stellar career and extensive involvement with terrorism investigations is reflected by her CV. Based on her review, she identifies several mitigating factors from her experience which distinguishes Mr. Doci from more serious offenders.

## A.    USSG §3A1.4 Does Not Apply.

The Government of course bears the burden of establishing by a preponderance of the evidence the facts necessary to support a sentencing enhancement. *See United States v. Lawrence,* 47 F.3d 1559, 1566 (11th Cir.1995).

Mr. Doci continues to maintain that USSG §3A1.4(a) does not apply. Under this provision: [i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32. USSG §3A1.4(b) provides: In each such case, the defendant's criminal history

category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The structure of § 3A1.4 establishes two separate bases for applying the enhancement: (1) when the defendant's offense "involved" a federal terrorism crime; or alternatively, (2) when his offense was "intended to promote" a federal terrorism crime. *United States v. Arcila Ramirez*, 16 F.4th 844, 849 (11th Cir. 2021).

The term "federal crime of terrorism" as used in §3A4.1 "has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." See USSG § 3A4.1 cmt. n.1. Section 2332b(g)(5), requires both that: (1) the offense is a violation of one or more enumerated statutory provisions, and (2) the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." See § 2332b(g)(5)(A), *United States v. Fidse,* 862 F.3d 516, 522 (5th Cir. 2017) (*Fidse* II). In *United States v. Fidsi,* 778 F.3d 477, 481 (5th Cir. 2015) (Fidsi I) the Fifth Circuit recognized that a conviction for conspiracy to make false statements "is not a 'crime of terrorism' enumerated in § 2332b(g)(5) and thus his offense did not 'involve' a federal crime of terrorism."

Even where the underlying offense is enumerated in 18 U.S.C. § 2332b(g)(5) the Government must still show that it was calculated to

influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct. *Arcila Ramirez,* 16 F.4th at 854-855 (reversing the §3A1.4 enhancement for a conviction under violation of 18 U.S.C. § 2339(b)(1)-for providing material support to a terrorist organization-absent findings that it was calculated to influence, affect, or retaliated against government conduct). To assume an offense listed in §2332b(g)(5)(B) is *per se* a "federal crime of terrorism" without a separate finding as to "calculated" would render the "calculated" requirement in § 2332b(g)(5)(A) superfluous. *Fidse* II, 862 F.3d at 524 n.6; *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008) (vacating and remanding because the district court "did not make any factual findings related to the intent [i.e., calculation] element.").

While the Government appears to recognize that Mr. Doci's conviction under 18 U.S.C. § 1001 does not "involve" a federal crime of terrorism, it relies on the contention that the offense was intended to promote a federal crime of terrorism. The phrase "intends to promote" implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." *United States v. Graham* 275 F.3d 490, 517 (6th Cir. 2001). To "intend to promote a federal crime of terrorism" requires that the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the

5

defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *United States v. Awan*, 607 F.3d 306, 314 (2d Cir. 2010). The Eleventh Circuit has agreed "it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorist crime, the enhancement is triggered." *Unites States v. Mandhai,* 375 F.3d 1243, 1248 (11th Cir. 2004).

Courts have limited to the enhancement to circumstances where the government can establish the specific federal crime of terrorism the defendant's conduct was intended to promote. See *United States v. Benkhala,* 501 F. Supp. 2d 748, 753 (E.D. Va. 2007) citing *Graham,* 275 F.3d at 517 (holding that a district court must identify with particularity which "federal crime of terrorism" a defendant intended to promote).

In a case in which the defendant was not actually convicted of a federal crime of terrorism or the defendant's relevant conduct did not include such a crime, a district court must: (1) "identify which enumerated federal crime of terrorism the defendant intended to promote"; (2) "satisfy the elements of § 2332b(g)(5)(A)," which requires that the offense be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (3) "support its conclusions by a preponderance of the evidence with facts from the record." *Fidsi,* II 862 F.3d

at 523. accord *United States v. Arnaout,* 431 F.3d 994, 1002 (7th Cir. 2005) and *Fidse* I, 778 F.3d at 481.

Therefore, for example, "[i]t is possible for a defendant to provide material support to a terrorist group in violation of 18 U.S.C. § 2339B(a)(1) without intending that the support or resources would influence, affect, or retaliate against government conduct to satisfy the first prong of the definition of federal crime of terrorism." *United States v. Alhaggagi,* 978 F.3d 693, 699 (9th Cir. 2020)(citing *United States v. Chandia (Chandia I),* 514 F.3d 365, 376 (4th Cir. 2008). The enhancement, therefore, does not automatically apply even to all material support offenses.

"Thus, to warrant a substantial increase in punishment pursuant to the terrorism enhancement, a defendant must have the requisite intent necessary to satisfy the definition of federal crime of terrorism, beyond the intent required to establish a violation of the material support statute.*"Alhaggagi*, at 699. The enhancement applies only if a defendant had some intent not required for the jury to find him guilty. *See also United States v. Jumaev,* 2018 WL 3490886, *6. Sentencing Order.  (D. Col. July 18, 2018).

While the Eleventh Circuit has not gone so far as to say that "specific intent" is required under § 2332b(g)(5)(A), s*ee Blanco* at 116, it did make clear in *Arcila Ramirez,* that the "calculated" prong of § 2332b(g)(5)(A) imposes an

7

intent requirement such that "the government must show that the defendant's offense was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive." 16 F.4th at 854. [1] In any event, once the Government identifies the federal crime of terrorism involved, it must further establish that Mr. Doci's intent went beyond what would be required for a conviction for that offense.

Further, it is the guideline commentary as opposed to the guideline text states that an obstruction offense, "may support the enhancement" under the "intended to promote" prong. *See Fidse* I, 778 F.3d at 481. Application Note 2 provides that "an offense that involved ... obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." USSG. § 3A1.4 cmnt. n.2.

In its Sentencing Memorandum, the Government relies on this commentary. Doc. 82: 14, 18. As the reference to an obstruction offense comes from the commentary only, *United States v. Dupree,* 57 F.4th 1269 (11th Cir. 2023) *en banc*, limits its application. In concluding that the commentary could

---

[1] Other courts have imposed a specific intent requirement under § 2332b(g)(5)(A). *See,* e.g., *Alhaggagi*, 978 F.3d at 699–700; *United States v. Hassan,* 742 F.3d 104, 148–49 (4th Cir. 2014); *United States v. Wright,* 747 F.3d 399, 408 (6th Cir. 2014); *United States v. Mohamed,* 757 F.3d 757, 760 (8th Cir. 2014); *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009) ("[C]omission of a federal crime of terrorism ... incorporates a specific intent requirement.") (quoting *Chandia* I, 514 F.3d at 376).

not be used to include inchoate offenses for purposes of USSG §4B1.2 comment n.1, the court relied on the Supreme Court's decision in *Kisor v. Wilkie,* 139 S. Ct. 2400, 2414 (2019), which clarified that a federal agency's interpretation of its own regulations is entitled to deference "only if a regulation is genuinely ambiguous." As there was no ambiguity in that USSG §4B1.2 did not include inchoate crimes, *Dupree* held that the commentary could not be used to bring such offenses within the definition of a "controlled substance offense" for guideline purposes. *See id.* at 1280. *Dupree* therefore limits the application of the guideline commentary to circumstances where it clarifies a truly ambiguous guideline provision as opposed to expanding the reach of the guideline text. Mr. Doci maintains that the commentary here violates *Dupree* if it is construed as bringing every "obstruction" case relating to alleged terrorism within § 3A1.4 without additional findings that the offense involved or was intended to promote a federal crime of terrorism.

Mr. Doci maintains that any finding that his statements made in his interview three years after his online activities were intended to promote a federal crime of terrorism would be unwarranted.  As the court noted in *Fidsi II* the application of §3A1.4 in an obstruction case "makes sense to the extent that a defendant can intend to promote a crime by trying to prevent the government from finding out about it." 862 F.3d at 522. (internal quotations

omitted). While the Government asserts that Mr. Doci's dedication to ISIS continued up his arrest in 2023, there does not appear any evidence of Mr. Doci remained involved even at the time of his January 2022 interview.

While the remoteness in time is certainly relevant to Mr. Doci's variance request it is also particularly relevant to his opposition to the enhancements. This shows Mr. Doci's misstatements in his 2022 interview were calculated to shield him from his own responsibility as opposed to promoting ongoing activity. Under the Government's view any time a subject denies involvement in a crime it would be considered to be promoting the original offense.

However, even back between in the earlier time-period, Mr. Doci involvement was not calculated to promote a federal crime of terrorism in that there was no intent to influence, affect, or retaliate against government conduct by intimidation. Rather, Mr. Doci's involvement during the earlier time-period was to benefit families, particularly widows and orphans, and victims of the ongoing conflict. His conduct was never calculated to further terrorism as it was not calculated to influence or affect the conduct of government by intimidation or coercion or retaliate against government conduct.

The government broadly asserts that Mr. Doci sent money overseas to ISIS and provided guidance to others as to how to send money to ISIS. (Doc.

82:3). It appears the Government's basis for this is, set out in its Sentencing Memorandum, with respect to the November 2017 online conversation. Doc. 82:8-9. This was a brief discussion about sending money through Western Union or RIA and involved "100 as a start." Doc. 82:8. As opposed to millions or even tens of thousands of dollars, the Government recognizes that Mr. Doci was involved with ""no less than *hundreds* of dollars. . . ." Doc. 82:7 (emphasis added). In fact, there was extended discussions about relatively small amounts. It is not clear where this money actually went. The Government's theory is that it went to support ISIS. It could also have gone to families suffering because of the war or, equally plausibly, to individuals seeking to obtain money for themselves under the guise of a cause.

Ms. Cormack's report bears on the absence of the required calculation. Specifically, she suggests that it is plausible that that the primary purpose in the small amount of money that Mr. Doci was involved in distributing overseas was not to fund terrorist activities but to support families with only a minor and potentially misguided portion directed towards what he perceived as helping individuals in conflict situations. Cormack Report ¶ 6. Further, Doci's posts often highlighted the [Syrian] Assad regime's attacks on women and children. Doci claims his financial aid was intended for women and children, not directly supporting ISIS operations. Although he admitted that the

recipients were associated with ISIS, his belief that the funds were for humanitarian relief for the widows and children of the fighters could be considered as a mitigating factor. Cormack Report ¶ 7.

Finally, the cases cited by the Government in support of the enhancement involve far more severe conduct than that attributed to Mr. Doci. Doc. 82:13-14, 16 *See e.g., United States v. Suarez*, 893 F.3d 1330, 1333 (11th Cir. 2018)(plotting a bond attack on a Florida beach in support of ISIS); *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015)(weapon of mass destruction); *United States v. Siddiqui*, 699 F.3d 690, 708-709 (2d Cir. 2012) (attacking American military personnel and FBI agents).

For all these reasons, Mr. Doci maintains that §3A1.4 does not apply in the first instance.

## B.   A Departure Under USSG §4A1.3 Is Warranted Should the Court Impose the § 3A1.4 Enhancement.

Should the Court disagree, Mr. Doci would then maintain that a guided departure under USSG §4A1.3 would be warranted. If reliable information indicates the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood the defendant will commit other crimes, a downward departure may be warranted. *See* USSG § 4A1.3(b)(1).

Particularly because of the automatic increase to Criminal History Category VI, courts have found §4A1.3 applicable when §3A1.4 is applied. *See United States v. Alhaggagi,* 372 F. Supp. 2d 1005, 1017 (N.D.Cal. Mar. 8, 2019), (departing to criminal history category I), *vacated on other grounds* in *United States v. Alhaggari,* 978 F.3d 693 (9th Cir. 2020); *Jumaev,* at*9 Sentencing Order, ("A judge determining that [the Terrorism Enhancement] over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.1 to depart downward in sentencing.")(citing *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir. 2003) and *United States v. Benkahla,* 501 F. Supp. 2d 748, 758 (E.D.Va.2007))(applying §3A1.4 and then a downward departure under §4A1.3 to drop the defendant's criminal history from VI back down to I). The sentencing court in *Jumaev* continued:

> The automatic assignment of a defendant to a Criminal History VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines, It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant, who has had no criminal history, a fictional history of the highest level of seriousness.

*Jumaev at* *9 (quoting *United States v. Mehanna,* No. 1:09-cr-10017-GAO (D. Mass. April 12, 2012) Sentencing Tr. 69:14-24.[2]

_____

[2] The district judge in *Jumaev* concluded the enhancement was unwarranted. However, the court further stated that if the enhancement had

13

Mr. Doci has no prior criminal history, and there is no evidence that raises concerns that he would recidivate. In fact, all evidence is to the contrary. The interview covered matters that occurred well before the interview and over and several years ago. There is no evidence that Mr. Doci had any involvement thereafter. Belying any claim that Mr. Doci presents even a remote risk, not only did the government not arrest him following the January 2022 interview, or in the preceding years, but made no effort to even prevent him from continuing to work at the airport for the next year after his interview. Moreover, Mr. Doci has now been on conditions of release for nearly twenty months without even the slightest concern.

C.   **A Substantial Downward Variance is Also Warranted Particularly Should the Court Impose the §3A1.4 enhancement.**

The Probation Office has previously identified Mr. Doci's lack of criminal record and the impact of the sentence on Mr. Doci's wife as potential grounds for a downward variance. PSR ¶ 100. While the Court will, of course, consider all the § 3553(a) factors, Mr. Doci maintains the following are particularly relevant.

---

been applicable, a departure to Criminal History Category I would have been granted. *See Jumaev,* at *9.

14

1.    <u>It is Appropriate to Offset the §3A1.4 Enhancement.</u>

Should the Court impose the §3A1.4 enhancement, Mr. Doci respectfully moves this Court to impose an offsetting downward variance below the calculated guideline range.

Of course, after calculating the guidelines and any departures courts must engage in a holistic inquiry of the § 3553(a) factors" and that a "variance can be imposed without compliance with the rigorous requirements for departures." *United States v. Gannt*, 679 F.3d 1240, 1247 (10th Cir. 2012). As §4A1.3 only permits the Court to proceed on the horizontal access, this departure would only begin to address the draconian impact of the §3A1.4.

If applied, this enhancement would result in a guideline range which severely over-states an appropriate sentence. *Kimbrough v. United States* 552 U.S. 85, 128 S. Ct. 558 (2007) allows courts to avoid a rigorous application of a particular guideline to the offense at hand and in the process to disagree with the policy considerations behind the guideline. Mr. Doci maintains that no guideline is more apt for such a critical analysis under *Kimbrough* than §3A1.4. Not only does it result in a dramatic increase in the guideline range, but it is applied equally to the most violent offenses to the most benign. Thus, a person who is moved by the plight of those impacted by war and assists in a small way is subject to the same enhancement under §3A1.4 as an individual who

provides explosive devices, personnel in the form of himself and/or others, and raises thousands of dollars for and travels to and trains fighters involved directly in terrorism. Moreover, when §3A1.4 is applied, there is no distinction between the sentences for violent and nonviolent crimes. Section 3A1.4 also applies equally to individuals with the most serious criminal history and individuals like Mr. Doci with none at all. Rather the terrorism enhancement treats all defendants as if they are career criminals. The enhancement is thus antithetical to the dictate of § 3553(a)(1), which requires a court to consider a defendant's history and characteristics in making its sentencing determination. *See also United States v. Alhaggagi,* 372 F. Supp. 2d 1005 at *22 (N.D.Cal. Mar. 8, 2019), ("the terrorism enhancement's treatment of criminal history flies in the face of fair, individualized sentencing"), *vacated on other grounds* in *United States v. Alhaggari*, 978 F.3d 693 (9th Cir. 2020).

"Post-*Booker*, federal courts are instructed to fashion a sentence based on a variety of statutory factors under 18 U.S.C. § 3553(a), including "the nature and circumstances of the offense and the history and characteristics of the defendant." However, unlike with other crimes, sentencing in the terrorism context--and the Terrorism Enhancement especially--fails to address these factors. The Terrorism Enhancement treats all offenders the same, without

considering their actual conduct or individual background, such as age and criminal history.

Moreover, it has been recognized "[t]he terrorism enhancement is not backed by any empirical evidence." *See Jumaev,* at *10 n.16 (citing James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 112 (2010) ("[W]hen U.S.S.G. [§] 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline.").

Mr. Doci respectfully requests the Court consider a variance to offset the outsized impact of § 3A1.4.

2.    Mr. Doci's history and personal circumstances.

Mr. Doci's history and personal circumstances additionally support a downward variance. Like many before him Mr. Doci came to the United States to escape violence and upheaval in his native country.

Mr. Doci is an ethnic Albanian born in 1978 in the former Yugoslavia, now Kosovo. In the 1990's Serbia, also part of the former Yugoslavia, attacked Kosovo leading the Balkans War. The United States sought to protect Kosovo militarily. Life at that time was very difficult. Many, including his parents,

lost their jobs. The country lived under a dictatorship. Serbian troops patrolled the streets, stopping people -including Mr. Doci- at random. Mr. Doci, in his letter to the Court, describes Serbian occupiers killing people, women, children, men, and the elderly in the most barbaric ways. Appendix A. Mr. Doci further relates "they begin expelling us from our homes and carrying out ethnic cleansing against the Albanian people. Mr. Doci described one occasion when he was struck by Serbian troops. PSR ¶ 61. Mr. Doci credits the United States with "saving" his country." Appendix A.

Mr. Doci was fortunate enough to emigrate to the United States in June 1999. He did not speak English at that time. His family primarily remained in Kosovo. When he first arrived, he settled in Orlando and assumed a series of jobs to send money to his family remaining in Kosovo. PSR ¶¶ 76-79. For many years and until his arrest, Mr. Doci held various positions at the airport. Most recently he worked for G2 Secure Staff as a wheelchair agent.

Mr. Doci became a United States citizen in the late 2000's. In 2010 he married his wife Gjyle in Kosovo. They had been together since before he came to the United States. She had to remain in Kosovo until the end of 2016 when she was able to join him in Orlando. She does not speak English and does not drive. Even before her health challenges, she was completely dependent on Mr. Doci.

As noted in the Pre-sentence Report, Mr. Doci's primary concern is his wife's health challenges. She indicates that he has stood by her every step of the way including through two breast biopsies and thyroid and gynecological biopsies. B-1.

Mrs. Doci's support for her husband is supported by other family members. His brother-in-law, Nehat Munishi, describes Mr. Doci has embodying "honesty, nobility, and generosity." B-2. He likewise relates Mr. Doci's qualities as a husband to his sister as "not just love but a profound sense of responsibility and commitment to her well-being." *Id*. Mr. Doci's cousin, Kimete Doci, also attests to his character and discusses growing up together in Kosovo where they experienced "both joyful memories and unimaginable hardships." B-3.

Similar and consistent views of Mr. Doci's character are supplied by friends and co-workers. His former supervisor at G2 Secure Staff, Brian Haskin, indicates that he had known Mr. Doci for several years from the airport, and "jumped at the opportunity" to hire him in 2022. As a wheelchair agent, Mr. Doci went out of his way to make sure that the passengers with disabilities had a "great experience during stressful times." Significantly, Mr. Haskin indicates that he would have no issue hiring Mr. Doci in the future. B-4. A former co-worker, Julio Vaquen, relates that "very seldom you meet

someone who takes care of passengers the way he does, he is kind, considerate, professional, and most of all does his best." B-5. Butrint Derguti, who knows of Mr. Doci's significant challenges coming from Kosovo, has come to "deeply respect his character, resilience, and dedication." B-6 Valina Rexha, an educator who has known Mr. Doci for seven years, relates his efforts to assure that individuals working with him at the airport have employment and educational opportunities. She describes him as a "pillar of reliability and trustworthiness in his professional community." B-7. Bujar Rexha, a friend who also is an Albanian from Kosovo, cites the impact of the challenges Mr. Doci faced from the war, and states that he has shown strength in the face of these hardships. He describes Mr. Doci has someone who has earned his upmost respect and admiration. B-8. Besnik Sinani, another friend, recites a time in 2018 when he lost his job and Mr. Doci helped him get a job at the airport. He indicates that Mr. Doci "is well known in the community and at the Orlando International Airport as a hard worker, well-liked and charismatic person where everyone has respect for him." B-9. Diego Lopez rents a room in his house to Mr. Doci and his wife. He describes Mr. Doci and his wife as "quiet, polite, and correct with all their activities." Further, Mr. Doci is "very correct with his obligations, takes good care of his family and respects every individual that surrounds his life." B-10.

Far from the picture painted by the Government, Mr. Doci and his wife live very simply. They rent a room in Mr. Lopez's home while Mrs. Doci continues to work at the airport.

Mr. Doci's character, including his close and stable family circumstances, along with the other factors discussed, further support a downward variance.

Mr. Doci's letter to the Court expresses his regret for making the false statements to the FBI agents in January 2022. While no doubt he was not completely forthcoming, he took steps to partially remedy this by attempting to contact the agents within days of the January 2022 interview.

3.    <u>The Context of Mr. Doci's Involvement in this case.</u>

There are numerous relevant factors that explain and mitigate Mr. Doci's involvement. To be clear, Mr. Doci is very remorseful for both his online involvement and later failure to be completely candid with the agents. Attachment A. As he indicates, "I am very sorry for being involved in this case, and especially for my failure to be fully honest with the FBI agents in January 2022. I also understand that my online activities from 2016–2018 were wrong. However, I was motivated by what was happening in Syria at the time, including the brutal attacks by the Assad regime against Sunni Muslims. I fully understand now, and have for some time, that my actions were wrong." Appendix A.

21

Among the things that set this case apart from cases involving similar charges is that Mr. Doci is not a religious zealot. Cormack Report ¶ 1. Nor does he have an anti-Western ideology. Rather, his motivation was his perception that Sunni Muslims, such as himself, were being persecuted by the Assad government in Syria. As Ms. Cormack notes "Doci's interest in supporting ISIS was claimed to be restricted to mostly helping individuals in Syria, not the broader ISIS agenda. Further "ISIS has used Assad's Alawite (Shia) affiliation and his regime's actions as part of its propaganda to rally Sunni fighters and justify its actions in Syria. The group's narrative often paints the Syrian government as an oppressor of Sunni Muslims, portraying themselves as defenders of Sunni rights. This nuance could be significant in assessing the nature and extent of his support for ISIS." Cormack Report ¶ 11. Consequentially, Mr. Doci could easily be manipulated by ISIS propaganda. Cormack Report ¶ 10. "Mr. Doci's consistent criticism of the Shia, including the brutality of the Assad Regime in Syria against Sunni Muslims, can be seen as indicative of his personal beliefs and alignments, which may provide context for his communications with other groups or individuals. This suggests that his actions were more focused on specific conflicts or groups rather than broad support for all actions or policies of ISIS." Cormack Report ¶ 9. Mr. Doci's posts often highlighted the Assad regime's attacks on women and children. Doci

claims his financial aid was intended for women and children, not directly supporting ISIS operations. Although he admitted that the recipients were associated with ISIS, his belief that the funds were for humanitarian relief for the widows and children of the fighters could be considered as a mitigating factor. Cormack Report ¶ 7.

Additionally, Mr. Doci's susceptibility must be viewed through the lens of his own experiences. As Ms. Cormack observes "[a]s a refugee from Kosovo, Doci's experiences might have shaped a more complex view of geopolitical and humanitarian issues. During the Kosovo conflict in the late 1990s, ethnic Albanians, who are predominately Muslim, were the primary targets of oppression and violence carried about by the Serbian and Yugoslav forces. Doci experienced firsthand the atrocities associated with ethnic cleansing. This traumatic experience likely deepened his sensitivity to similar crises. Refugees often carry the psychological scars of their experiences, which can affect their worldview and actions in complex ways. Cormack Report ¶ 4.

Although perhaps misled for a period of time, Mr. Doci has expressed his strong love and support for the United States, which he credits for saving his country.

Significantly, Mr. Doci's attempt to reach out to the agents by text on four occasions within the next few days following his January 2022 interview

show a proactive attempt to cooperate outside of the formal interview. According to Ms. Cormack this shows Mr. Doci's attempt to assist the investigation and accept responsibility for his actions. Cormack Report ¶ 5.

    4.    <u>Mr. Doci does not pose a danger to the community.</u>

As discussed above with respect to the proposed departure, Mr. Doci does not pose a risk to the community. It bears repeating that Mr. Doci, who has no criminal records, has never been charged with any activities occurring before the January 2022 interview despite an open investigation since 2018. No effort was made to even interview Mr. Doci before that, despite his employment at airport. Although he continued to work at the airport, they took no action against him for another year after the interview.

 In this regard, Ms. Cormack cites what she labels as a degree of trust the FBI seems to have had with Mr. Doci. She cites his continued employment at the airport, with access to sensitive areas through a multi-year investigation, suggests that the FBI did not regard him as an immediate threat. Cormack Report ¶ 2. This stands to reason as despite expressing opinions online, Mr. Doci was, at best, a small-time participant.

The Government's inactions over the course of a multi-year investigation bely its current claim that Mr. Doci poses a danger.

## CONCLUSION

Mr. Doci maintains that the properly calculated guideline range does not include the enhancement under §3A1.4. If applied, however, he maintains that a sentence well below the guideline range is appropriate both as a departure under USSG §4A1.3 and a variance under the factors set forth in 18 U.S.C. § 3553.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

/s/ Russell K. Rosenthal
Russell K. Rosenthal
Florida Bar No. 0319244
Assistant Federal Defender
2075 West First Street, Suite 300
Fort Myers Florida 33901
Telephone: 239 334-0397
Facsimile: 239 334-4109

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of June 2025, a true and correct copy of the foregoing has been filed in this court and a copy was forwarded by CM/ECF mail to Kara Wick, Assistant United States Attorney.

s/ Russell K. Rosenthal
Russell K. Rosenthal, Esq.
Assistant Federal Defender